## Case No. 16,342a.

### UNITED STATES v. SMITH.

#### [MS.]

Circuit Court, D. New York. July, 1806.

CRIMINAL LAW—ACT JUNE 5, 1794—MILITARY EXPEDITION AGAINST NATION AT PEACE— EVIDENCE—CONFESSIONS.

[1. On the trial of an indictment for a misdemeanor in beginning, setting on foot, and providing the means for a military expedition against a nation with which the United States are at peace, the president's message to congress, and other documents transmitted therewith, are inadmissible to show the existence of a war at the time the acts were charged to have been committed.]

[2. An expedition, to be within the act, need not have been consummated without deviation of course. It is sufficient if it was begun, and the means prepared to be carried on from the United States, though the vessel at the identical time of sailing was not in complete readiness for hostile engagements.]

[3. Confessions of defendant, whether in crimination or justification, are to be taken together.]

[Trial of William S. Smith, indicted under the act of congress of June 5, 1794, § 5 [1 Stat. 384], for a misdemeanor in beginning, setting on foot, and providing the means for a military expedition to be carried on from the city of New York against the dominions of Spain in South America, the United States and Spain being at peace. Proceedings on the plea in abatement to the indictment are reported in Case No. 16,341a. Proceedings on a motion for an attachment against absent witnesses and for a continuance will be found reported in Case No. 16,-342.

[After the close of the evidence for the prosecution, Mr. Colden, of counsel for defendant, asked permission to read to the jury the message of the president of the United States to congress at the opening of the last session, with a variety of other documents which were transmitted by him to congress at the time, to show that the United States were then at war with Spain.]

Mr. Sanford. We object to their being read, if the court please. The message of the president might be evidence to congress of the situation of our country, but it is not addressed to a court and jury. Every question of this kind should receive the decision of its proper tribunal; the questions involved in the president's message have received such a decision, and therefore must be at rest. We found ourselves in this objection upon the decision of the court, before whom it was fully discussed. But the counsel has not told us how he means to apply the message and documents. Is it for the purpose of setting up a justification? The court has determined that they are inapplicable for that purpose; therefore they cannot go as evidence to the jury. They first attempted to maintain that the government sanctioned this expedition; that not being permitted,

they now mean to show that they had a right to decide upon the president's message, whether we were at peace or at war; a question which is the exclusive province of congress to determine.

Mr. Colden. There is nothing in the decision which the court has made which precludes the testimony we offer. If there be, I have totally misunderstood the honourable judge who delivered the opinion of the court. We offered as a justification or excuse, to prove by the testimony of the witnesses whom we have subpœnaed, that the president of the United States sanctioned and approved the acts for which the defendant is now to answer. The court decided, as I understood, that although the witness should be able to make this proof, yet, as the sanction or approbation of the president would be no justification or excuse, the court refused to grant compulsory process to bring up witnesses, whose testimony, in the opinion of the court, would be irrelevant. But the question now before the court, is totally distinct from any that has been agitated, and has received no decision. We acknowledge, that the purpose for which we would introduce these documents, is to show, that at the time the expedition mentioned in the indictment was set on foot, this country was not at peace with Spain, or, which is the same thing, that Spain was not at peace with us. The court observed that we had not stated in our affidavit that we expected to prove by the witnesses we have subpœnaed that we were at war with Spain; and therefore, the court thought we could not say that their attendance was material on that ground. But, if I am not mistaken, it was to be inferred from the argument of the judge, who delivered the opinion of the court, that if we had stated in the affidavit that we expected to prove this fact, viz. that there was war with Spain, by the witnesses we have summoned, then their testimony would have appeared material, and the compulsory process we applied for would have been granted. It is true, it was the opinion of the court, that the power of declaring war vested entirely with congress. And that the president's declaration could not place us in a state of war. But this is very far short of saying, that we may not show, by any competent testimony, that there was an actual state of hostility between this country and Spain, or rather that Spain had committed aggressions and hostilities against our territory, commerce and citizens, which amounted to actual hostilities, or a state of war on her side at least.

TALLMADGE, District Judge. The court made observations but on the materiality of the witnesses: they did not go to this point, but that you were not entitled to parol evidence to prove that the country was at war.

Mr. Colden. I understand the decision of the court as I have stated it. And cannot presume that we shall not be allowed to show, that the United States were not at peace with Spain. And if we can prove that at the time that this expedition was fitted out, Spain was in open and violent hostility against this country, whatever may have been the disposition of this country to remain at peace, however reluctant she may have been to make a declaration of war, however patiently we may have been inclined to bear the wrongs and violence that were offered to us; yet without our will, and against our consent, there was an end to our peace with Spain. For we could not have been at peace with Spain, when Spain chose to be at war with us. We shall read these documents, then, to show what was the actual state of things between this country and Spain; and shall rely on these official communications of the executive, as the highest evidence of the facts which they state. For as they are made to congress by the president, in obedience to that part of the constitution which directs, that he shall, from time to time, give to the congress information of the state of the Union. There can be no higher evidence. Nor can there be an objection to our reading these documents from the newspaper which we have in court; which must derive some authenticity from its being the newspaper of the government, so far, at least, as being selected for the publication of its laws. In England the Gazette is received as evidence of the public acts of the government. Rex v. Holt, 5 Term R. 442. In the Case of Thomas Cooper, in the Pennsylvania circuit court, this kind of testimony was allowed; and in 8 State Trials, 212, the Case of John Quelch, paragraphs from the London Gazette were read, to show that there was peace between Portugal and England. Though I do not much rely on this last authority, because, although the Gazette was read, yet when an objection was afterwards raised to the testimony, the court seem to have thought it unnecessary to decide whether it was proper or not. As we offer this testimony merely to show acts of hostility against this country, on the part of Spain, it will be obvious that it does not raise the question, whether the president can put the country in a state of war, without the assent of congress. We mean to prove, that without the will, or approbation, or act of the president, or of congress, there was a war de facto with Spain. And if so, then the defendant was not guilty of fitting out an expedition against a power, with which the United States were at peace.

Mr. Hoffman. I did not expect any objections would be made to the proof now offered. I understood the opinion of the court on the motion to postpone the trial, as effectually deciding on the competency of the proposed testimony. The judge, who delivered that opinion, stated, as a reason why

the trial should not be put off, that the affidavit did not allege that the witnesses could prove the existence of war between Spain and the United States. The statement of this fact was unimportant, if war could only have existed by an act of congress; for, in that case the court must have taken judicial notice of such act. The remark, therefore, could only have applied to a war, whose existence was to be proved by circumstances and facts, independent of any legislative act; by circumstances and facts, proper for the consideration of a jury, and which, like all other matters in pais, should be submitted to them, under the charge of the court. It certainly was said by the judge, and in express terms, "that Spain could not be at war with the United States, and they at peace with Spain." But, notwithstanding the reasoning adopted on that occasion, and the conclusive opinion of the judge, which I have just mentioned, it seems we are again to discuss the question, whether the United States can be at war, without a declaration of war by congress. The objection now made, goes to exclude all testimony of the fact, excepting such a declaration. It must be granted, that Spain would not be prevented by our constitution from committing aggressions; nor would her monarch trouble himself even to read that instrument when inclined to commence hostilities with the United States; and, profoundly as I respect the talents and ingenuity of our learned opponents, I apprehend it would be difficult even for them, to persuade any persôn of common understanding, that Spain would wait for an act of congress to authorize her to make war on the United States. We have only then to alter the manner of stating the question, and all difficulties vanish—Could Spain be at war with us, and we at peace with Spain? The answer is self-evident, and testimony ascertaining that Spain was at war with the United States, is all that is necessary to establish the fact of absolute warfare between both nations, and ought unquestionably to be received. The message of the president, with the documents officially submitted by him, tend directly to establish, that Spain had commenced hostilities against the United States; not merely acts of violence and predatory aggressions by her subjects, but open and avowed warfare, permitted and authorised by her government. In that message and its accompanying documents, therefore, we offer the best and highest proof of the fact. By the third section of the second article of the constitution, it is made the duty of the president, "from time to time, to give congress information of the state of the Union." This provision embraces equally the external and internal situation of our country: the president therefore discharges an official duty in communicating to congress our relative situation with foreign powers; and

his communications form the highest evidence of facts, of a public or political nature. They must be received as such, when necessary for the purposes of defence in a criminal prosecution. Unfortunate indeed, would otherwise be the situation of an accused individual, who, having acted under their authority, is refused their production, as exculpating testimony, and is punished for a laudable confidence in the declarations of the first magistrate of the Union. Again. The constitution declares that "the executive power shall be vested in a president of the United States of America." Is it not a branch of the executive power to declare the condition of the nation, particularly as it regards foreign governments? If not, to which department of our government is this power intrusted? Not to the legislative department, for it holds no intercourse with foreign nations, the president being the sole organ of such intercourse—to him, likewise, belongs the right of interpreting all treaties between foreign governments and our own —of deciding upon the relative duties of one to another—and of enforcing their performance. The executive department alone, therefore, can declare, in the first instance, the political state of our nation; whether it be hostile or pacific. Such was likewise the opinion of our Washington, and he acted upon this principle in his proclamation of neutrality, issued during the early stages of the French revolution; wherein he declared the condition of the nation, as it regarded France. By some it was pretended, that he had exercised an unconstitutional power; but the measure received the applause of every true friend of his country, and the approbation of its constituted authorities. But, it is said, that the duties of the executive are distinctly marked out in the constitution, and that no powers devolve on him, but those specifically enumerated, in the second and third sections of the second article. If so, I ask, from whence does the president derive his right to remove from office? A right of late not unfrequently exercised. The counsel for the prosecution, I am confident, are not disposed to question the exercise of this very important function; but, I will thank them to show, where it is included under any presidential powers, which are specially defined in the constitution. They cannot. It is a right springing only from the general grant of executive power —a power, which remains in all other cases equally unimpaired; unless when controuled in its exercise, by the qualifications contained in the second and third sections. This is not a novel doctrine. It was the doctrine of the first congress, as the debates of that day will manifest; and, I am greatly misinformed, if the present secretary of state, one of the most distinguished members of that honourable body, did not take a decided part in advocating the same princi-

ples of construction, which I support at present. Sure I am, they are the only rational and sound ones, that can be used, in giving a just interpretation to the constitution. The constitution provides, "that congress shall have the power to declare war," and until they do declare it, cry our opponents, the nation is at peace! I shall offer at present, a very few remarks, in reply to this assertion. War is either offensive or defensive. This distinction is used, only for the purpose of distinguishing the nation, which offends, or which commences the war, from that which defends itself against the attack. The war is offensive by the party which commences it; on the opposite side, it is defensive. The rights of both nations, as to the extent and nature of hostilities are equal. The defending nation is not confined in her resistance, to the mere point of attack. She can at once remove the seat of war, from her own territories, to the dominions of her enemy, and in prosecuting her defence, injure the aggressive power by direct and absolute attacks. May not therefore a defensive war exist, and all its rights attach, without a formal declaration by congress? If not, a singular paradox has grown out of the constitution. Between two nations, there may exist a state of complete war on the one side, and of peace, or at least, a species of qualified war, on the other. Our constitution, which it has been said, and with justice, was the work of the wisest men, and most enlightened patriots of the nation. cannot be charged with a doctrine so inimical to our safety and our honour. It is a doctrine originating in this prosecution, and as novel as many others by which it is distinguished. The plain and obvious meaning of the constitution, is, that it is the province of congress, when the nation is at peace, to translate it into a state of war. When an option exists, the choice is with them. But, when a foreign power attacks and makes war on the United States, they are then, by the very fact, already at war, and any declaration by congress, would be idle and nugatory.

I conclude by insisting, that a congressional declaration of war is not the sole evidence of war, actually existing between Spain and the United States. The official communications of the president, made to congress, ought to be received, as evidence of the facts, which they contain, and from them the jury have a right to decide, whether Spain and the United States were at peace at the time of the offence charged in the indictment.

Mr. Emmet. I did not intend to trouble the court on this question; but to reserve my exertions, and whatever talents and arguments I may possess, until I have the honour of addressing the jury on all the matters connected with my client's defence. I am induced, however, by the solicitations of my friends near me to alter a resolution, which was not suggested by indolence, but by attentive observation of the whole course of this prosecution; and not to abandon the last effort, which it will probably be necessary to make, exclusively with the court, for bringing forward the defendant's case to the best advantage. Our object is to give evidence as to the state of the country, with respect to its relation with Spain; for that purpose we offer the president's message to congress, and the other documents to which it refers, and with which it was originally accompanied. It is the president's duty, under the third section of the second article of the constitution, to lay before the congress information of the state of the Union, and of course, of our relations with foreign powers. This message was delivered in performance of that duty; and is therefore, at least, prima facie evidence of the facts which it contains. If it and the other accompanying public documents shall be rejected as inadmissible evidence, I confess I do not know where the defendant is to look for any better testimony as to this part of his defence. But it is stated that the decision of the court, on the motion for putting off the trial, has precluded us from giving evidence as to this point. If so, I think, with the utmost deference, that the court travelled out of the subject-matter before it. I pay profound and willing respect to its decisions, when they relate to the matters submitted to it by the parties; but when they pronounce without necessity upon irrelevant topics, they become extrajudicial, and cannot lay claim to the same authority. Did the court say we were precluded from examining the question whether this country and Spain were at peace? That was never presented to it as the question for its consideration. Our application for putting off the trial was grounded on the absence of witnesses, who could prove, not the state of peace or war, but the president's knowledge and approbation of the defendant's conduct. Why should we be precluded from examining the question whether this country and Spain are at peace? In the indictment it is averred that Spain was at peace with the United States. It is therefore a fact comprehended in the general issue joined in this prosecution; and we are surely entitled, under all the rules of law, to show that it is false. I request the attention of the court to this point. The adverse counsel admit they are bound to prove the fact; but they refuse to us the privilege of disproving it, of counteracting their proofs, and of showing that they are mistaken. Was there, or not, war de facto, is emphatically a question of fact, and as such ought to be submitted to the jury: if they should be of opinion that there was such war, the whole of the indictment is not proved. It seems, however, to be argued, that a war de facto is not sufficient to disprove the indictment, because it is founded on a statute which is declaratory of the law of nations; and that the words of the statute are to be construed with reference to that law.

It would be a sufficient answer to that argument to say, that a war de facto is recognised by the law of nations; but further, I beg leave to dissent from the opinion that this statute is declaratory of that law, although the assertion has proceeded from an authority which I highly respect. By looking at the statute, it will be found to have been originally enacted for only two years; the limitation of its duration shows that it was not intended to be declaratory of the law of nations; for that law is perpetual, and does not require to have its meaning declared every second year. The object of the act is not declaratory, but to create and describe a crime and to annex a penalty to its commission. The argument drawn from that assertion, I think, therefore, fails on every ground, and that we ought to be permitted to give the president's message in evidence of outrages committed by Spain on our frontiers, and her depredations on our commerce; whether they amount to war de facto will be matter of consideration for the jury; but we have a right to show, if we can, that the relation of peace was broken by Spain; that she carried on hostilities, violated our territories, and waged war upon our trade. Permit this to be shown, and she will not appear to be a nation at peace with us; nor will the absurdity be maintained, that we were at peace with her, when she was at war with us.

Mr. Harison. I presume that if there is any principle in our law, certain and incontrovertible, it is that in all criminal cases the jury are the judges of the law, as well as of the fact. And from this principle it follows, that no question purely of law can arise, connected with the guilt or innocence of the defendant, which is to be considered as exclusively belonging to the court, and not within the cognizance of the jury. For if, as to certain propositions so connected, the court can pronounce that by law either the affirmative or the negative is to be considered as existing, and exclude the evidence relative to that proposition, it will result, as an inevitable consequence, that they can limit and confine the province of the jury within such bounds as they themselves shall deem proper. They can assume the several propositions and controul the verdict according to their pleasure. In the determination of this cause, the question of peace or war is of primary importance; because, to establish the guilt of the defendant, it must appear that the expedition was against a nation with whom the United States was at peace. Such is the express declaration of the statute. It is therefore "a turning point," to be determined by the jury whether we were at peace with Spain when the offence is supposed to have been committed; and if the jury are to determine it, they must have every species of evidence that is fit to demonstrate the actual situation of affairs between the two countries. In opening this cause to the jury, the district attorney seems to have been fully convinced of the doctrine for which I am now contending. He then informed the jury, that the fourth point which he should establish would be that this country was at peace with Spain, when the offence was committed, which is charged in the indictment. At this time, however, he insists that this is a mere point of law, about which the court only is to judge; without reflecting that the great maxim I have already noticed would be violated by his doctrine; and without considering, that in relation to this point, legal inferences can only be deduced from facts antecedently appearing. In criminal cases, it cannot be proper for the court to assume the fact, and determine the law. They cannot tell the jury, this country was at peace. Such is the law; and you are to determine the guilt or innocence of the defendant upon that supposition. If the court could do this, the power of the jury in criminal cases would indeed be feeble, and very different from what we have supposed. But, admitting that the question of peace or war may be proper for a jury, we are told that no war can exist without a declaration by congress. Consequently, that no evidence but the act of congress can be received, to demonstrate the existence of a war between this and any other country. The federal constitution has, indeed, provided that "the congress shall have power to declare war;" and thence it is inferred that war cannot exist without such declaration. But surely, this provision of the constitution can only relate to cases where there is an option to embrace the alternative of peace or war; and it by no means implies that a formal declaration is essential to the existence of actual warfare. If the enemy commences the attack, we may appeal to arms immediately, and without any ceremony. The state of peace is no longer in being; and from the very instant that the aggression takes place, the two contending powers, by the law of nations, which is founded upon the law of nature, are to be considered as enemies. Even allowing then, that as to offensive war on the part of this country, the doctrine of our opponents would be correct; yet it should be remembered that there is a defensive, as well as an offensive war; and that the state of peace or war between two countries implies reciprocity. Both must be at peace, or both will be at war. So that, if a foreign country should declare war against the United States, or attack their territories, or commit acts of open hostility and aggression, this country would be in a state of actual warfare, without a declaration of congress upon the subject. If any doubt could be entertained whether to constitute a war in such cases, it is necessary that there should be a precedent declaration, I could refer the court to the most approved writers upon the law of nations; to Grotius, Puffendorf, Barbeyrac, Vattel, and others; all of whom (whatever may be the discordance of their opinions as to the necessity of declaring war when it is in its nature offensive) agree in the sentiment that under such circumstances as I have already stated, no rule of the law of nations

would be violated, if war should be carried on without being declared.[1] I might add that the constitution itself has contemplated a case in which war may exist without any declaration of congress; where a state may engage in it, though not invaded, if in such imminent danger as will not admit of delay. The question, then, as to the state of our peace, must depend upon a variety of circumstances, and may be made evident to the jury by a variety of proofs. In the case of offensive war, the declaration of congress could be resorted to; and where the war commenced by the acts of aggression of the enemy, the acts might be proved in the same manner as every other fact of great notoriety. If then this country might have been actually at war with Spain, without any declaration of congress, it will only remain to show that the president's message is proper evidence to establish the fact. Here I must observe to the court that, by a particular provision of the constitution of the United States, it is made the duty of the president, to give congress information, "from time to time, of the state of the Union." Hence, his official communications to the legislature, must be considered as stamped with the character of truth, and carrying in themselves the most irrefragable evidence of those facts which they relate. The state of the Union depends, not only upon its internal circumstances but also upon its situation with respect to foreign powers; and when the chief magistrate of the Union exhibits to the congress a state of facts, there can be no higher evidence to establish their existence, and the consequences that result from them.

The court will no doubt recognize the presumption of law that all magistrates execute their duty with fidelity; and this presumption shall prevail until the contrary is shown. But if such a presumption exists as to the ministers of justice and subordinate magistrates of the country, it must apply, with much more force, to him who is invested with the highest dignity, and most important trust. It would be indelicate to suppose that he had deviated from the truth, and it would require the most convincing proofs to establish the fact. We hope, therefore, that the president's message will be admitted in evidence for the consideration of the jury; and we trust it will convince them that the United States were not at peace with Spain, as is alleged in the indictment.

One objection, however, still remains to be noticed. It is said the present questions have been determined by the decision of the court, upon our application to compel the attendance of witnesses. But I do not think this is the case. If I am not mistaken, the court

mentioned that if the United States were not at peace with Spain, the defendant could not be guilty; and that the affidavits produced by the defendant, did neither allege the existence of a war on the part of the United States, or that the witnesses could prove it. As far as the language of the court then went, according to this statement, it seems to imply that the question of peace or war was open for discussion; but as we did not allege the materiality of the witnesses to prove the state of warfare, the court could not defer the trial on account of their absence. We were certainly under no necessity at that period of the cause to allege the state of warfare, for any other purpose but to obtain the attendance of those witnesses. If we did not judge it proper to make the allegation for that purpose, still we have a right upon the trial, to avail ourselves of the defence, and if permitted to do so, it will be a complete justification.

Mr. Sanford. I shall be extremely brief in reply to the arguments of the gentlemen who have dilated so much upon the point now before the court. The authority cited to show that the gazette is proper evidence to go to a jury, is inapplicable until a previous question shall have been decided. The question immediately before the court, and which I apprehend must be first decided, is whether the defendant can be allowed to offer any evidence whatever to the jury, to show that the United States were at war with Spain. If it shall be decided, that the defendant is entitled to give evidence to the jury, to show a state of actual war, an ulterior question may then arise, whether the gazette, or whatever else may be offered is proper evidence for that purpose. I shall, therefore, entirely abstain from a discussion of the latter question, and shall return to our former proposition on this subject, which is, that the question of peace or war under this statute, is a question of law to be decided by the court, and not a question of fact to be decided by the jury. If then, this be the point which is now presented to the court, I conceive that it has already been very fully discussed, and has already received the decision of this court. The adverse counsel are pleased to say, that they did not understand that this point was before decided. They surely have not so soon forgotten that this very argument was discussed upon the argument of the motion for a postponement, and for attachments. Did they not there urge, that the testimony of their absent witnesses was wanted for the purpose of establishing a state of actual war? And was not their whole train of reasoning upon this subject the same that has now been urged? The opinion of the two judges, as I understood it, was, if not in terms, at least by necessary consequence, that the question of war or peace under this statute, is a question of law exclusively for the decision of the court. (Here he recited

---

[1] Vide Bynk. Quest. Publ. Jur. lib. 1. c. 2; Vatt. Law Nat. lib. 3. c. 6. § 57; Grot. de Jur. B. et P. lib. 3. § 6; Puff. de Jur. Nat. & Gent. lib. 8. c. 6, and the notes of Barbeyrac; "Heineccius Systema Juris," bk. 2. c. 9. § 197; Hen. Cocceii et Sam. L. B. Cocceii, Com. ad Grotium; vide etiam Nolfii Jus Gentium, c. 6, § 713.

some parts of the opinion, for which vide ante pages.) This opinion, however, is not now before the court, and I can only cite it from memory. I will, therefore, rapidly recapitulate the reasons upon which we contend that the question of war or peace is in this case exclusively a question of law. The high power of making war, is vested by the constitution, in the legislature alone. This provision of our constitution, is evidently the result of that jealous spirit of liberty, which pervades the people of this country. The power of making war, so important to their interests, and if abused, so dangerous to their liberties, could not, consistently with that spirit, be vested elsewhere thân in the whole legislature. It follows, that under our constitution, the only evidence of a state of war which can be recognized by the courts, is the act of the legislature declaring it; for until the legislature has declared war, the nation is constitutionally and legally at peace. This consequence seems plain and undeniable. But the adverse counsel say, that war may exist in fact, though not declared by congress; that war may exist by the actual commission of hostilities, or may take place by the actual invasion of our country. They then ask, is not this war? And may not individuals, in such a state of things, undertake military enterprises against the offending nation without incurring the penalties of this statute? I answer, certainly not. I concede that the state of things which exists when the country is invaded, or actual hostilities take place, may in a certain sense of the term, be denominated war, and the counsel opposed to us, concede that war may exist by the declaration of congress, though no invasion or hostilities should have taken place. We find then, that we are here using the words "war" and "peace" in different senses. Our opponents talk of actual war, and we speak of war declared by congress. The question between us then, comes to this inquiry; in which of these senses have the legislature used the word "war," or its correlative "peace" in this statute? Without urging other topics in support of our construction, a very slight attention to the consequences of the opposite doctrine, will be sufficient to show that the word "peace" is used to indicate that state of things which exists when the nation has not declared war. Actual hostilities may take place by the irregularities or violence of individuals, or if the counsel please, the United States may be invaded, and yet the legislature may suppose that the best interests of the country require it not to declare war, but to attempt to obtain redress by negotiation. It cannot be denied that they are the constitutional judges of this question. If they have the constitutional right of deciding whether the nation shall make war or not, it follows that all the individuals of the community must submit to their decision. But the doctrine set up on the other side,

is the very reverse of this. It is now contended, that if actual hostilities have happened in any extent whatever, all the people of the community are absolved from their obligation to remain at peace, and may set on foot military expeditions, and make any sort of offensive war, though the government of the country should not have declared war, and should wish to remain at peace. According to this doctrine, any individual may, at any time, declare, that in his judgment, war has taken place, because some act of irregularity or violence has happened, and may take steps, the certain tendency of which, will be to precipitate the nation into a serious conflict. When Great Britain shall capture our vessels, or impress our seamen, or commit any other act of violence, which by itself may be denominated "war," it is then the right of every citizen, according to this doctrine, to fit out an armament to invade the territories of Great Britain, and make war upon her subjects.—When disputes are subsisting between the United States and Spain respecting territorial bounds and Spanish troops occupy a part of the disputed territory, claiming it as their own, this is called an invasion of our territory, and is denominated "war"; and Colonel Smith, and every other citizen of the United States, is therefore at liberty to undertake hostile enterprises against the dominions and people of Spain, though the government of the country, with a full knowledge of all the circumstances, has decided that it will still remain at peace.

These are the consequences of the doctrine now urged on the other side, and however absurd are not exaggerated. It never can be seriously imagined, that the legislature used words in a sense which must lead to such absurd consequences. The plain and obvious meaning of this statute is, that while the government of the country are at peace, all the citizens should be bound to observe the duties of that situation, and the very object of the statute is to prevent individuals from plunging the nation into war, by their own unauthorised acts of violence. The peace, mentioned in the fifth section, is described to be peace between the United States, and the foreign prince or state, thereby indicating that state of things which exists while the nations, and their governments are at peace. Any other construction would lead to the solecism, so well described by the presiding judge of this court, who is now absent, in his late charge to the grand jury, of a nation at peace, and its citizens at war.

But the adverse counsel still ask, have not our citizens a right to defend themselves when the country is invaded? Certainly they may, but this does not in any degree prove, that they have a right, in such circumstances, to invade a foreign country in turn. Defensive war is a branch of the natural right of self defence, which is enjoyed by

communities and individuals in all circumstances whatever. The right of making offensive war, belongs solely to the sovereign power of the community, and can only be lawfully exercised by its authority. The rights of defensive warfare are not in question in this case, but the inquiry is, in what circumstances the citizens of this country, may invade the territories of another. Our position is, that according to the constitution of the United States, and the true meaning of this statute, no citizen can set on foot military expeditions, or make war against the dominions of a foreign state, until the relations of peace shall have been dissolved by an act of congress. In this case, no law has passed declaring war, or authorising hostilities against Spain. Our treaty with Spain is still in force, and is therefore the supreme law of the land. It results that in these circumstances, the court is judicially bound to consider the two nations at peace, and that the proposed inquiry is improper.

Mr. Hoffman. The counsel for the prosecution have the right of closing this argument; but, as the decision of the present question involves very important principles; and is intimately connected with the defence of my client, I ask permission to follow my learned opponent (Mr. Edwards) who has just spoken. I am greatly mistaken if I shall not refute his reasoning, and establish our own arguments, by the very authorities which he has produced. It has been asked, with a degree of triumph, if a private citizen can capture the property of an enemy, or commit depredations on his commerce, without regular commission or authority. Now it so happens, that we have never contended for a principle so illegal, nor evinced such ignorance of the law of nations. The question and answer were equally the offspring of the counsel's own fertile imagination; and could only have been introduced to divert the attention of the court from the true point in discussion, or to afford himself an opportunity of displaying his ingenuity in refuting arguments which we should have been ashamed to advance. We fully admit, that an individual acting offensively against a common enemy, must be regularly authorised by his own government, otherwise his aggressions might be deemed piratical, and himself rendered liable to punishment, as well by the foreign nation as by our own tribunals. The court surely understands that Col. Smith is not charged with an offence of this nature; that the indictment is founded on a particular statute; and that to bring him within its penalty, Spain must have been at peace with the United States. But we offer to prove her at war, and the sole question is on the admissibility of the evidence, necessary to establish that fact. Our opponents contend, that a declaration of war by congress is the only legal evidence of the fact. This we deny. And it must be granted, if we are right, that the evidence we offer is of the highest nature, and must be received. I certainly feel much indebted to the learned counsel for his research into the laws of the United States; and thank him for their production, which occurs so opportunely for the support of my argument. They were not within my recollection, or I should have read them, as furnishing a practical construction of the constitution. They have been rightly considered as a legislative interpretation of that instrument. Before I advert to these acts, I will notice the 12th article of the amendments to the constitution, which says: "The powers not delegated to the United States, by the constitution, nor prohibited to it by the states, are reserved to the states respectively, or to the people." This amendment was pressed into the argument with all the zeal of sincerity; yet I am at a loss to comprehend its connexion with the present discussion. We are agitating, whether the United States were at war, or in peace? The right to determine on the one or preserve the other, is expressly delegated to the United States: neither the states respectively, nor the people at large, can exercise any constitutional power over this question; its decision exclusively belongs to the general government; and the present inquiry is, to which department thereof does it belong? Further—The object of this amendment, was to prevent the United States (not particular departments of its government) from assuming the exercise of powers by implication; tending to infringe the sovereignty of the states, or to violate the rights of the people. The nature of our federal government, excited a vigilant and cautious jealousy on this subject; and the amendment was made to insure the jurisdiction, and local sovereignty of the states over all matters, not peculiarly of national interest or concern. A chapter of the alcoran would have elucidated the gentleman's argument as clearly as the amendment.

Let us see whether he has been more fortunate in his reliance on acts of congress. The first quoted is the act of the 27th of March, 1794, entitled "An act to provide a naval armament." [1 Stat. 350.] It recites that "the depredations which had been committed by the Algerine corsairs on the commerce of the United States, rendered it necessary that a naval force should be provided for its protection;" and it authorises "the president to provide six frigates," and makes the necessary provision for officering and manning them. This act provides the ways and means for a naval force, but contains no direction for its employment or destination. The framers of the law knew the full extent of their constitutional powers. They knew, that it was the duty of congress to provide the ways and means for carrying on war, but that it belonged to the executive of the union to direct the public force.—The last section, is important, as it plainly indicates, we were then at war with Algiers: "If a peace shall take place between the

United States and the regency of Algiers, no farther proceedings are to be had under the act." What! were we then at war with Algiers, and without any declaration of war by congress? Yes; and congress, without whose declaration, the gentleman would have us believe, that the United States must always enjoy the tranquillity of peace, do not, by this or any prior act, declare war against Algiers; they find it already commenced without their concurrence. The choice of decreeing the fact is superseded by the fact itself. They increase our naval forces, and forbid their reduction "until peace shall take place." Again—I ask how congress became informed, that Algiers was at war with us? They are not charged by the constitution with the intercourse between us and foreign powers, for that is an executive function. I apprehend a little more research would have produced a message from the president, wherein he judges of the fact himself, and recommends a more effective force to be provided. What is this, but his declaring the situation or state of the nation, as it respects Algiers? To comment on each of the laws cited by the counsel, would be an unpardonable waste of time; I shall only notice some of them, and that in a very cursory manner. The next in order is an act passed April 20, 1796 [1 Stat. 453], and being merely supplementary to the law first read, cannot invite a single additional observation. We have next "an act for providing a naval armament," passed July 1, 1797, which makes provision for the officering and manning of two frigates. I remark, that the act of March, 1794, was no longer in force, peace having taken place with Algiers; and the statute of 1796, provided for the building of frigates, but not for their equipment, or the subsistence of their officers and crew. It would lengthen out my reply unprofitably to mention, even by name, the numerous statutes which have been read. They are generally of the same import—one authorises the president to build or purchase twelve ships—another adds some revenue cutters—a third allows our merchantmen to protect themselves, and, by a fourth our intercourse with France is prohibited. Why they have indiscriminately been forced into this day's service, I am at a loss to comprehend; nor have I been able to learn, from the arguments of the counsel, the application of any, excepting the first and the last, to the present question. These I gladly present to the consideration of the court; they bear strongly on the present question; and, in my judgment, place our doctrine beyond a doubt. Before I consider them, I repeat one general observation, "that war can exist between the United States and a foreign power, without a declaration of war by congress."

Now for the acts: The first is the act of May 28, 1798, entitled "An act authorising the president to raise a provisional army." [1 Stat. 558.] This act called forth many strong remarks from the gentleman; and from his language, I am to conclude that he spoke the genuine convictions of his judgment; his inferences and my own, from the same source, are very different, and the court will decide between us. This law declares, "that the president of the United States be, and he hereby is authorised, in the event of a declaration of war against the United States, or of actual invasion of their territory, by a foreign power; or of imminent danger of such invasion, discovered in his opinion to exist; before the next session of congress, to cause to be enlisted and to call into actual service a number of troops," &c. Do not congress here, by express terms, contemplate the fact of the United States being at war, by the sole act of a foreign power? An army is to be raised and to be called into actual service, not in consequence of a declaration of war by congress, but in the event of war declared against the United States. And let it always be remembered, that the nature and the place of this actual service are left to the judgment of him, in whom the constitution has wisely confided the direction of the national forces. It must be admitted, that this act is no declaration of war; it is prescriptive, and it supposes a war may prevail between the United States and a foreign power, before the next session of congress.—Prevail—how? The reply is obvious; congress would be out of session. The war could not proceed from their act; yet it might take place by a declaration of war against the United States, and in that case, congress considers us, in every sense of the term, a nation at war. Our nation would be stamped with the character of belligerent, and its warlike operations would assume an offensive or defensive course, as circumstances might demand. This act is wholly inconsistent with the assertion, that the nation must always be at peace, until congress shall declare it at war. I come now to the last act, passed March 2, 1799 [1 Stat. 725], entitled "An act giving eventual authority to the president to augment the army." This act differs from the preceding one, as far as I can at this moment discover, only in its phraseology. Instead of providing for a case where war shall be declared against the United States, congress, knowing that a foreign nation might make war, without any formal declaration to that effect, vary the terms before used, and provide "in case war shall break out between the United States and a foreign European power" for the augmentation of the army. The inference is too plain and too strong to be resisted. Can the court believe, that congress ever indulged so illusive an opinion, as that war or peace depended on their will or pleasure? "If war breaks out," (says the act) not by the choice of the United States, for then we admit that congress alone has the election, but, breaks out, by the acts of a foreign power, over whose decision and conduct congress could have no controul. The case here contemplated is altogether anal-

ogous with that, which we hope to prove existed at the time of the offence, charged in the indictment; for we offer expressly to show, that war had broken out between Spain and the United States; by Spain having, without any formal declaration, actually made war on the United States. If our testimony does not establish this fact, it cannot serve us.

Unfortunately for the gentleman, his inferences from the last statute, and the principle, for which he has so warmly contended, are directly at variance. "Congress alone," says he, have the only "power of declaring the nation at war." If this power is conferred exclusively on them, they cannot delegate it to any other branch of the government; for each department must execute its prescribed constitutional trust. We might as well say congress could devolve the whole duty of legislation on the president. I demand then, who was to judge the fact, whether or no, in the language of the last statute, "war breaks out?" The president. And his opinion would fix our nation exactly in that condition, where it is pretended congress alone could place it. What is this, but admitting the right of the president to pronounce, in the given case, the condition of the nation, by declaring that war did exist. Our reasoning is perfectly consistent; there is no incongruity in the exercise of the power, which we ascribe to the executive, and of the right vested in congress. When the United States are at peace, congress alone can elect to go to war; they cannot commit this choice to the president; but when war shall break out, or in other words, when a foreign power shall declare or make war against the United States, it is with the president to declare the fact, and with congress to provide the ways and means for defence.

I have thus endeavoured to confine my remarks strictly within the limits of reply. This argument was unexpected; but, feeble as it has been on my part, I cannot but hope it will prove satisfactory. I repeat my sense of obligations to the counsel, for the strength his better acquaintance with our statute laws, has afforded to our general proposition; for, if legislative sense and practice on an article of the constitution, can be deduced in aid of its true interpretation, we feel, that we stand upon sure and strong grounds.

I conclude with entreating the court always to distinguish, that we are not indicted for any offence against the law of nations; but charged with infracting a particular statute, of which there could be no breach, if Spain was at war with us. The public prosecutor has so shaped his indictment, and by it he must abide.

The argument on this point being closed, the judge, in a few words, decided that neither the president's message, or any of the documents that were offered, should be read.

Mr. Colden. We now offer testimony to show that the government had knowledge of the whole transaction.

TALLMADGE, District Judge. That has been decided as not being material to the issue. That question was deliberately settled in a full bench. I cannot attempt to alter it myself.

Mr. Golden. We do not ask to prove it by the gentlemen who are at Washington. We offer Mr. King as a witness, who is now here, to prove that the expedition was made with the knowledge and approbation of government.

TALLMADGE, District Judge. It cannot be received, as it is wholly immaterial.

TALLMADGE, District Judge (charging jury). Gentlemen, the trial upon this indictment has already occupied several days of your time. It is now drawing to a close. You have listened to the testimony of the witnesses and have attended to the argument of counsel. If in some instances the latter has been more at length than clear and illustrative, in others it has been ingenious and eloquent. This is a cause of considerable expectation and importance, both as it regards the individual accused, and as it relates to that system of neutral policy which hitherto our government have invariably pursued, and from which the United States, in a great measure derived, and are to expect, prosperity and happiness.—Conviction may not only subject the defendant to fine, but the loss of personal liberty; and should our government permit offences of this nature by passing them over with impunity, war and a participation in the quarrels and bloodshed of Europe must necessarily ensue. Need I say that such consequences ought especially to induce a jury to the most careful and dispassionate consideration of the evidence, and bear them superior to any prejudice which idle report, or out-door observation, may have excited. You will now give your attention to a review of this subject. It shall be my endeavour to present it in its native state stripped of embellishment. It is my duty to state to you the law, the substance of the accusation, and the defence.

You have heard much said upon the right of a jury to judge of the law as well as the fact. Be assured, that on this occasion there is not the least desire to abridge those rights. I am an advocate for the independence of the jury. It is the basis of civil liberty, and in this country I trust will ever be a sacred bulwark against oppression and encroachment upon political freedom. The law is now settled that this right appertains to a jury in all criminal cases. They unquestionably may determine upon all the circumstances if they will take the responsibility and hazard of judging incorrectly upon questions of mere law. But the jury is not therefore above the law. In exercising this right they attach to themselves the character of judges, and as such are as much bound by the rules of legal decision as those who preside upon the bench. It was delivered as the opinion of this court by the judge who presided at the commencement of the term, and it is still my opinion that the United

States were at peace with Spain at the time the defendant is charged with the offence in the indictment. It was also the opinion of the court, and no subsequent argument has changed my view of the subject, that the previous knowledge or approbation of the president to the illegal acts of a citizen can afford him no justification for the breach of a constitutional law.—The president's duty is faithfully to execute the laws, and he has no such dispensing power. These points have received the decision of the court seriatim, and I trust a jury will not set up a contrary opinion but with great circumspection and deference to the learned judge who delivered them, the necessity of whose absence is a subject of regret, and whose opportunity for correct legal decision is obviously so far superior to what falls to the common lot of jurors.—Should you however choose not to confide in the correctness of the court in this respect, the data exhibited, and which will lead to your determination of these points, are a view of the constitution and laws of congress giving and defining the power of making war; the powers and duty of the executive branch of the government—the statute upon which the indictment is preferred, and the treaty of San Lorenzo, 1795, which stipulates "that there shall be a firm and inviolate peace and sincere friendship between his Catholic Majesty and the United States." You have no document, nor any proof before you, establishing a state of things contrary to the stipulations of the treaty I have now read.—Certain papers have been offered in evidence, which, it is said, acknowledge aggressions by Spanish subjects, and evince a state of war in fact between the United States and the king of Spain.— By authority of the former decisions, those were decided irrelevant and rejected as improper evidence. The United States cannot be constitutionally at war, but when war is authorised by congress, or is rendered an act of necessity by the invasion of a foreign enemy. Principles of self defence in such case point it out as the duty of the chief magistrate of the nation in the interim of congress to repel force by force. The greatest scope of the jury is to determine upon points arising upon the pleadings and such evidence as is permitted to come before them. It is the exclusive province of the court to determine upon the admissibility of evidence. That which their judgment rejects as improper, the jury have no right to presume. The contents of those papers is unknown, and conjecture can never afford safe ground for the decision of a jury, sworn to determine truly. Our living at peace is what constitutes the offence. For although the defendant was concerned in setting on foot, or preparing the means for a military expedition against the Spanish dominions, if the United States were at that time at war with Spain, he would be innocent, and should you so determine, you will acquit the defendant upon his indictment.

The indictment against William S. Smith, contains counts, charging him with offences prohibited by an act of congress of June, 1794. The fifth section of that act reads as follows: "That if any person shall, within the territory or jurisprudence of the United States, begin or set on foot, or provide, or prepare the means of any military expedition or enterprise, to be carried on from thence, against the territory or dominion of any foreign prince or state, with whom the United States are at peace, every such person, so offending, shall, upon conviction, be adjudged of a high misdemeanour," &c. It is the peculiar province of the jury to inquire, whether the evidence adduced maintains the charges in the indictment. If it fully supports any one of them, it will be your duty to find him guilty. The proofs in relation to the matters of fact, charged in the indictment, have very properly been divided, into that which regards the setting on foot, providing or preparing the means within the United States, for an expedition or enterprise to be carried on from thence— that which regards the object, and that which manifests the defendant's participation and agency in setting on foot and preparing the means for such expedition or enterprise.

A summary of the testimony of the many witnesses who have been examined to prove the first point is, that the Leander, a merchant vessel, owned by Samuel G. Ogden of this city, and for some time previously used in the St. Domingo trade, had just returned from a voyage from that island, when she was chartered to take out Gen. Miranda and such persons as should choose to go along with him. The vessel immediately underwent repair and alteration suitable to the particular purpose; having a new lower deck built in her hold. She cleared out at the custom-house on the 23d January, and sailed from this port on the 2d February last—had a very crowded cargo, and was laden almost entirely with articles of warlike preparation. From 180 to 200 men were here engaged in the enterprise, several of them immediately after took military title and rank, and all were submitting to subordination and discipline. Eleven or twelve hundred suits of soldiers' uniform— about 600 swords and cutlasses, and a great number of belts, pouches and cartridge boxes—about 4,500 pikes—a number of muskets, horsemen's pistols and blunderbusses, all of which were principally in boxes or casks. Exclusive of her complement of 17 guns, the Leander had on board about 34 cannon, with several field carriages—150 casks of gun powder, and a quantity of ball suited to cannon and muskets of different caliber. These articles were chiefly purchased by the captain of the vessel, Armstrong, upon the credit of Mr. Ogden, and sent on board with a view to the enterprise. The object was either military or commercial. Miranda was

at the head of the expedition, who for 20 years has made no secret that his wishes and intentions were inimical to the duration of the Spanish government in South America. His declarations to Mr. Ripley, to Col. Platt and Swartwout, avow his design of returning to his native country, the province of Caraccas; to revolutionize it, and to free his countrymen from what he terms the yoke of Spanish oppression. Allurements, military honours and rapid fortune, were held in view to induce men to enter upon an enterprise, secret and unexplained, while written assurances were given that the service should neither be against the French nor English. The testimony of Mr. Rose, who went out in the Leander from this city, and remained on board until the capture of the two schooners, and Miranda's return with the Leander to Barbadoes, will more clearly than that of any of the other witnesses, enable you to determine whether the original intention of the preparation and outfit of the Leander was for a military expedition, or mere commercial enterprise. The witness swears that soon after the vessel left the Hook, he with several others were industriously employed in making handles to the pikes, and putting the arms on board into complete readiness for actual service. That the vessel first touched at Jacquemel, but did not there unload any of her cargo, or transact business of a commercial nature, and only remained to recruit a few men and equip the two schooners, to accompany and support the Leander in the enterprise, out of the supplies she brought from New-York. While at Jacquemel Miranda issued commissions to those who took military rank and office, before the Leander left this city. From St. Domingo this squadron proceeded to Aruba on the road to the Caraccas, when the men were all landed and underwent military parade and inspection, and here first were made acquainted with the particular destination. The hostile landing of a military force, and the distribution upon the main, of proclamations in the Spanish language, headed by Miranda's name, as general and commander in chief, next are attempted off Porto Cabello by the very men who were engaged in this city, armed and equipped with the very preparations provided and carried from here. These attempts are opposed by Spanish government vessels; an engagement ensues; the invaders are beaten off, with the loss of the two schooners and many of the men.—The Leander returns alone, taking the course to Trinidad, but falling in with an English sloop of war the Lilly, with her went into Barbadoes. The counsel for the defendant urge this to be a mere commercial enterprise, from the facts, that the vessel had been previously occupied in the West-India trade; that the articles composing her cargo, were those of ordinary commerce. the open manner they were purchased and put

on board, and that the Leander was not in complete condition and readiness to carry on a military enterprise at any time, while she remained within the United States. I think there is some reason to doubt the correctness of this position, and to suspect that the 1,200 suits of soldiers' uniform, the regimental coats, the cannon drills, the chest of armourer's tools, and the case of surgeon's instruments, not to be paid for unless the expedition should be successful, were not intended as articles of commerce.

It is not necessary that the expedition should be consummated without deviation of course. Was it begun, and were the means prepared to be carried on from the United States? The words of the statute are, "If any person within the territory or jurisdiction of the United States, shall provide or prepare the means of a military expedition, to be carried on from thence;" therefore, it matters not whether or no, the vessel, at the identical time of sailing, is in complete readiness for hostile engagement. You are not to inquire of her capacity to achieve the object. If, in fact, the Leander sailed with the intent, and means to carry on such an enterprise, I conceive the transaction comes within the prohibition of the act. But the facts in evidence is the proper business for your determination. In the case I mentioned yesterday, under this very act, for a similar offence, tried April, 1795, Paterson, Justice, charged the jury, "that converting a merchantship into a vessel of war, must be deemed an original outfit;" for the act would otherwise become nugatory and inoperative.—It is the conversion from the peaceable use to a warlike purpose, that constitutes the offence. The vessel in question, arrived in this port with a cargo of coffee and sugar from the West-Indies, and appears to have been employed by her owner with a view to merchandize, and not with a view to war. The inquiry is, therefore, united to this consideration, whether, after her arrival, she was fitted out in order to cruise against a foreign nation, being at peace with the United States. It is true, she left the wharf with only four guns, but it is equally true, that when she dropped to some distance below, she took on board three or four guns more, a number of muskets, water-casks, &c. and it is manifest other guns were ready to be sent to her by the pilot-boat. These circumstances clearly prove a conversion from the original commercial design of the vessel, to a design of cruising against the enemies of France, and of course against a nation at peace with the United States, since the United States are at peace with all the world. Nor can it be reasonably contended, that the articles thus put on board were articles of merchandize, for if that had been the case. they would have been mentioned in the manifest, on clearing out of the port, whereas it is expressly stated that she sailed in ballast.

If they were not to be used for merchandize, the inference is inevitable, that they were to be used for war. No man would proclaim on the house top that he intended to fit a privateer.—The intention must be collected from all the circumstances of the transaction.

It now only remains to consider how far the defendant was concerned in beginning, providing and preparing the means of the expedition. Col. Smith mentioned to Doctor Douglass, before Miranda arrived in the United States from England, that he had expected that a grand expedition was on foot and that his son was going. After Miranda did arrive the defendant introduced him, first to Mr. Lewis, one of Ogden's captains, then to Mr. Ogden, as persons likely to aid him with a vessel proper for his purpose. He employed the witness, Fink, to engage a sergeant, corporal, and twelve men for military service. The testimony of Mr. Fink appears to be candid and I think entitled to belief; but he is an old inhabitant of the city and you know his character. He swears he saw Col. Smith write the papers which contain the terms of the enlistment and promise of bounty lands. The defendant paid a month's wages to the witness to be advanced to each of the men so engaged, tied up and marked with the name of each man; and although there appears to have been among them some hesitancy about the propriety of their engagement, the men afterwards all declared themselves satisfied, and finally went upon this very advance of bounty. The verbal declarations and assurances of the defendant to the witness may be considered delusory and purposely intended to misguide and cover from the men the real object of their engagement, yet those clearly manifest the agency and participation of the defendant in providing the means for the enterprise. That these means were so provided and prepared by the knowledge and approbation of the president and secretary, you have already the opinion of the court, can afford the defendant no justification in the breach of positive law, however far the fact, if so, may operate to produce a pardon from the executive. But the testimony relied upon as establishing this fact is by no means positive or entitled to implicit confidence. It is the declaration of Miranda alone which charges the administration with previous information of the expedition; whose scanty means afforded him abundant reason to mask his real feebleness with any pretensions, the best calculated to facilitate the accomplishment of his views. The deliberate declarations of a party are indeed the strongest evidence against him. In the present instance these may induce a belief that the defendant was deceived in this respect by the equivocal or false representations of Miranda, but never can justify him in the illegal act charged in the indictment.

This is the state of the case before you. It is not a question of party politics. The people of the United States of all denominations are equally interested; and I have too much respect for the character of an American jury to anticipate a determination upon such grounds. The undertaking may of itself be a great and glorious one, worthy the breast of a good man, glowing with desire for the universal emancipation of those oppressed by the weight of monarchical power; nevertheless, an upright and dignified course of conduct, a harmonious intercourse with foreign nations is worthy the attention, is the duty of our government to cultivate and maintain. The laws must be observed and enforced. Sympathy ought not to cloud the conception nor warp the judgment of a jury whose duty simply is to pronounce truly upon the facts in evidence. The attribute of mercy is in other hands, and no doubt will be discreetly exercised.

Mr. Harison: I wish to correct a mistake which I think the court have fallen into, who has said to the jury that the confessions of the party are not to go in justification. His confessions, whether in crimination or justification, are to be taken together. The law is laid down in Trials per Pais, 298.

TALLMADGE, District Judge. I mean to be understood that the confessions of the party must be viewed entire, not in detached parts; the purport and meaning of the declaration must be collected from a view of the whole conversation at the time. You will not convict the defendant but upon clear and satisfactory evidence of his guilt, nor acquit him against evidence, because he has declared himself innocent.

Mr. Colden. I humbly conceive that the confessions of a party, made at one and the same time, are not to be taken, stronger as they are against him, than as they are for him. The counsel for the prosecution having thought proper to examine as to the confessions of the defendant, they must take them as they are given. They cannot reject a part and use the residue.

The jury retired, and after an absence of two hours, they returned a verdict of not guilty. Whereupon W. S. Smith is discharged from his recognisance, and his securities exonerated.